UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN DOE, *et al.*,

               Plaintiffs,

     -against-                           1:17-CV-846 (LEK/DJS)

STEVEN PATRICK, *et al.*,

               Defendants.

---

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

James Doe and his parents, John Doe and Jane Doe,[1] bring suit against defendants Greenwich Central School District (the "District"), Steven Patrick, the District's former high school track coach, and David Wever, a bus driver employed by the District.[2] Dkt. No. 1 ("Complaint"). Plaintiffs bring suit under 42 U.S.C. § 1983 ("Section 1983"), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), and New York law, alleging that Defendants violated James Doe's constitutional and statutory rights and committed various torts against him during a bus trip to a high school track meet on January 27, 2017 and the trip's aftermath. See Compl.

---

[1] John Doe and Jane Doe participate in this lawsuit both individually and on behalf of James Doe. Compl.

[2] Plaintiffs do not specify whether they sue Patrick and Wever in their individual or official capacities. See Compl. The Court construes the Complaint to bring suit against Patrick and Wever in their individual capacities, because to sue them in their official capacities would be redundant of suing the District. See Vassallo v. Lando, 591 F. Supp. 2d 172, 202 (E.D.N.Y. 2008) ("[W]ith regard to the individual defendants, to the extent that they are being sued in their official capacities, the claims against them are duplicative of the Monell claim against the [School] District.").

Presently before the Court are two separate summary judgment motions, one from Patrick and Wever (together, the "Individual Defendants"), Dkt. Nos. 77 ("Individual Defendants' SJ Motion"); 79 ("Individual Defendants' Statement of Material Facts" or "Ind. Defs.' SMF"), the other from the District, Dkt. Nos. 80 ("District SJ Motion"); 80-1 ("District Statement of Material Facts" or "District SMF"). Plaintiffs oppose both motions. Dkt. Nos. 84 ("Response to District SMF" and "Plaintiffs' Additional SMF"); 84-1 ("Opposition to District's SJ Motion"); 85-2 ("Opposition to Individual Defendants' SJ Motion"). The Individual Defendants and the District filed replies. Dkt. Nos. 88 ("Individual Defendants' Reply"); 90 ("District Reply"); 90-1 ("Response to Pls.' Additional SMF"). For the following reasons, the Court grants Defendants' motions with regard to Plaintiffs' federal causes of action and declines to exercise jurisdiction over their state law causes of action.

## II.      BACKGROUND

### A.  Factual Background

The following facts are undisputed unless otherwise noted. The Court provides more detail as necessary in its analysis.

During the 2016–17 school year, James Doe was a senior at Greenwich Junior-Senior High School (the "High School"), a school operated by the District. Ind. Defs.' SMF ¶ 1; District SMF ¶ 1. In January 2017, James Doe was 17 years old. Ind. Defs.' SMF ¶ 2; District SMF ¶ 2.

During most of his four years of high school, James Doe was a member of the cross-country, indoor track, and outdoor track teams. Id. ¶ 3. In January 2017, James Doe was participating in his senior-year indoor track season. Ind. Defs.' SMF ¶ 4. The head coach of the indoor track team was defendant Steven Patrick, who had coached the District's indoor and outdoor track teams for about 26 years. District SMF ¶¶ 8, 12.

*1. The Events of January 27, 2017*

On January 27, 2017, the District's indoor track team traveled on a District school bus to Utica College, in Utica, New York, to participate in a track meet. District SMF ¶ 4. James Doe had attended indoor track events at Utica College on three prior occasions throughout his junior and senior years of high school. Id. ¶¶ 5, 18. Utica College is about two hours and forty-five minutes from the high school by bus, id. ¶ 13, and on each of the three previous trips the bus had stopped for a bathroom break, id. ¶ 157.

On January 27, 2017, defendant David Wever was driving the bus. Ind. Defs.' SMF ¶ 4. Wever had never driven the track team to Utica College before. Dkt. No. 82-6 ("James Doe Deposition") at 26. The bus was equipped with audio and video recording equipment, including one camera located in the front and one in the middle of the bus. Id. ¶ 5; District SMF ¶ 14. The entire bus trip to Utica was thus captured on video. Dkt. Nos. 80-6 ("Tyler Affidavit"); 80-19 to -21 (together "Video"). Patrick sat in the front of the bus while, for most of the trip, James Doe sat near the middle. See Video.

The bus set out around 1:10 PM. James Doe used the bathroom at the High School before the bus left. James Doe Depo. at 32.

Sometime before 2:29 PM, a fourteen-year-old member of the girls' track team, B.W., asked if the bus could stop for a bathroom break.[3] District SMF ¶¶ 26, 153, 155. In response, Patrick asked if she could wait until the bus reached St. Johnsville, New York, a town the bus would pass through prior to entering the New York Thruway (the "Thruway"). Id. ¶ 26,

---

[3] It is not apparent from the Video when, exactly, B.W. may have asked for a rest stop. But James Doe testified that he heard her ask at some point, District SMF ¶ 153, and the Video does show Patrick asking B.W. at 2:29 PM if she can "wait until we get to St. Johnsville" for a bathroom break, id. ¶ 26.

However, the bus never stopped in St. Johnsville, entering the Thruway around 3:08 PM. Id. ¶¶ 21, 27. Shortly thereafter, Patrick asked B.W. if she could "hold on for 32 more minutes." Id. ¶ 156.

Between Exit 29A, where the bus entered the Thruway, and Exit 31, where the bus exited, there is one rest area: the Schuyler Rest Area. Id. ¶¶ 21, 23. At around 3:14 PM, Patrick and Wever had a conversation in which they decided not to stop at the Schuyler Rest Area, because, according to the GPS, they were only 27 minutes from Utica College. Pls.' Additional SMF ¶ 5–7; Resp. to Pls.' Additional SMF ¶ 5. At about 3:24 PM, when the bus was two miles from the Schuyler Rest Area, James Doe asked from the back of the bus, "Coach, can we use the bathroom, please?" District SMF ¶ 30. Patrick responded, "Can you hang on for 15 more minutes?" Id. ¶ 31. In reply, James Doe said, "No, I really have to go. I can't hold it for 15 more minutes." Additional SMF ¶ 8. However, the parties dispute whether Patrick was able to hear James Doe's reply.[4] Resp. to Pls.' Additional SMF ¶ 8; Ind. Defs.' SMF ¶ 8; Resp. to Ind. Defs.' SMF ¶ 8.

A few minutes later, the bus passed the Schuyler Rest Area. Patrick waved toward the rest area as the bus went by and, noticing that a bus from the Hoosick Valley Central School District was parked at the rest area, commented "aha, Hoosick Valley." District SMF ¶ 32; Pls.' Additional SMF ¶ 11. Wever then commented, "I guess the Hoosick Valley kids couldn't make it past the bathroom." District SMF ¶ 33. Shortly thereafter, Patrick commented "you know what your mother says whenever you take a long trip: use the bathroom and don't wear underwear with holes in it." Id. ¶ 34.

---

[4]  The District points out that James Doe's reply is intelligible from the rear microphone of the bus but not from the front microphone, located near the Individual Defendants. Resp. to Pls.' Additional SMF ¶ 8.

At 3:35 PM, the bus exited the Thruway. Id. ¶ 35. About a minute later, James Doe got out of his seat and walked to the front of the bus, where Patrick was sitting. Id. ¶ 36. As James Doe walked forward on the bus, Patrick said, "You gotta hold it for three more minutes. We'll be there in three more minutes, maybe four." Id. ¶ 37. Upon hearing this, James Doe turned around and walked back to his seat. Id.

At 3:40 PM, James Doe approached Patrick again and told him that he needed to use the bathroom. Id. ¶ 40. Patrick held up a full water bottle and suggested to James Doe that he not drink any more. Video at 2:42:40. James Doe then returned to his seat. District SMF ¶ 41. During this time, the bus was traveling on an arterial road with a small shoulder and no place to stop for a restroom. Ind. Defs.' SMF ¶ 16. Then, a minute or so later, James Doe walked to the front of the bus again and asked Patrick what would happen if he urinated in a bottle. Pls.' Additional SMF ¶ 21. In response, Patrick told James Doe that he would get in "big trouble" for doing so. Id. ¶ 22. The following exchange ensued:

> James Doe: I think I actually have to go in a bottle.
>
> Patrick: No, don't do it. Just make yourself [unintelligible] 1.5 miles.
>
> James Doe: It really hurts.
>
> Patrick: Cross your legs. Just cross your legs.
>
> James Doe: I've been doing that since, like, half an hour ago.
>
> Patrick: You've gotta get your mind off it. You're gonna have to hold it.
>
> James Doe: I can't.
>
> Patrick: Yes, you can. You can do it.
>
> James Doe: It hurts so much.
>
> Patrick: You can do it. You can hold it.

James Doe: I would run to Utica right now.

Patrick: You can hold it.

James Doe: I can't.

Patrick: Yes, you can. You gotta be tough. You gotta think about something
else. Just hang on. Look, here's the sign for Utica College. 1.2 miles.

Video at 2:44:59–2:45:35. James Doe remained in the seat behind Patrick for the remainder of

the trip. District SMF ¶ 43.

Shortly thereafter, at 3:45 PM, James Doe and Patrick had the following exchange:

James Doe: Coach, I don't know if I can hold it any longer. I'm serious.

Patrick: Just hold it. Just hold it. We're gonna go left and right then be there.

James Doe: I can't! [Unintelligible].

Patrick: You can do it. You can hold it. You can do it.

James Doe: I can't. No. It's coming out.

Patrick: Yes, you can do this. No, you can do this. Just hold it. You can do it.
No. You can hold it. No. No. You gotta be mentally tough.

James Doe: Coach, it came out.

Patrick: Hang on. Just hang on.

James Doe: It came out.

Patrick: Just hang on. Just hang on.

James Doe: Yeah, it came out. It literally came out.

Patrick: Right here. Utica College. This is it. You were right here.

James Doe: Coach, I peed.

Patrick: We'll have to bring a diaper next time.

James Doe: Yeah. It's on the ground, Coach. I told you I needed to stop.

Video at 2:46:42–2:47:35; <u>see also</u> District SMF ¶ 45. About thirty seconds later, the bus entered the Utica College campus, ultimately reaching its destination at the campus parking area about ten minutes later. <u>Id.</u> ¶ 46; Video at 2:47–2:57:30.

Upon arrival at Utica College, all the students exited the bus. Pls.' Additional SMF ¶ 35. Patrick examined James Doe's seat and said, "He really did pee all over the floor." <u>Id.</u> As he exited the bus, he said, "I can't believe he couldn't hold that," and laughed. <u>Id.</u> ¶ 36.

James Doe had no known medical difficulties with urination and had not told the District in the past that he had any concerns regarding urination. District SMF ¶ 127.

After urinating on the bus, James Doe began texting his parents, John and Jane Doe, asking them to buy him new running shorts on their way to Utica College. <u>Id.</u> ¶¶ 47–48. Upon exiting the bus, James Doe went to a portable toilet and changed into clean clothes that he had brought with him. <u>Id.</u> ¶ 49. Later, once his parents arrived, James Doe changed into his new running shorts and ran in the track meet. <u>Id.</u> ¶ 50.

At some point at the track meet, Jane and John Doe ran into Patrick. <u>Id.</u> ¶ 51. Patrick held up his hands and said to them, "[w]ell, I guess I learned my lesson. I'll know better next time." <u>Id.</u> ¶ 52.

### 2. *The Aftermath*

The next morning, Jane Doe sent an email to District Superintendent Mark Fish about the incident on the Utica bus trip the previous day. District SMF ¶ 56; Dkt. No. 80-9 ("Fish-Doe Email Exchange"). About 17 minutes later, Superintendent Fish responded to Jane Doe's email, telling her that High School administrators would investigate the incident. District SMF ¶ 57; Fish-Doe Email Exchange.

Later that same day, High School Principal George Niesz contacted Jane Doe to discuss what had happened on the bus to Utica. District SMF ¶ 61. Principal Niesz offered to meet with the Does that day, but they eventually agreed to meet the following morning, Sunday, January 29, 2017. District SMF ¶ 64. Also on Saturday, January 28, in response to an email from Jane Doe, Principal Niesz called the parents of another High School student, S.L., to get S.L. to take down a message S.L. had posted online about James Doe urinating on the bus.[5] Id. ¶¶ 65–72.

On the morning of Sunday, January 29, James Doe and his parents met with Principal Niesz, Assistant High School Principal Benjamin Cronin, and Athletic Director Kevin Collins to discuss the Utica bus trip. District SMF ¶ 74. The Does requested that Patrick be fired. Jane Doe Aff. ¶ 15. The administrators promised to investigate.[6] Id. ¶ 16. The parties also discussed whether James Doe would attend the next track practice, District SMF ¶¶ 75–79; Resp. to District SMF ¶ 77, and Jane Doe asked the District administrators to speak with James Doe's guidance counselor, Rebecca Catlin, in the event James Doe went to see her over the following days. District SMF ¶ 79. Jane Doe communicated with Catlin a number of times over the following weeks, though James Doe never went to see her. Id. ¶ 80–82.

After the meeting, Principal Niesz viewed the video recording of the Utica bus trip. Id. ¶ 83. That same day, he met with Patrick and informed him that he would be suspended at least until the end of the indoor track season. Id. ¶ 86. Principal Niesz also issued Patrick a "letter of counsel" relating to the Utica bus trip, to be placed in his personnel file. Id. ¶ 87. Principal Neisz

---

[5] The parties do not state whether S.L. removed the post.

[6] Cronin and Collins recused themselves from the follow-up investigation of the incident because they both had daughters on the indoor track team. Pls.' Additional SMF ¶ 48.

then called Jane Doe and told her that Patrick had been suspended for the duration of the indoor season. Id. ¶ 88.

On Monday, January 31, 2017, Superintendent Fish sent an email to the members of the District Board of Education, describing the Utica bus trip and the decision to suspend Patrick. Pls.' Additional SMF ¶ 38. Fish stated, "Looking forward we will need to reflect on Mr. Patrick's spring outdoor track appointment and his future as a coach in the district." Id. ¶ 40. In reply, a member of the board wrote, "What an awful situation, given Mr. Patrick's successes with our girls [sic] team." Id. ¶ 41.

On January 31, 2017, Athletic Director Collins met with the members of the indoor track team and informed them that Patrick had been suspended for the rest of the season. District SMF ¶ 93. He also told the members of the team that it would be inappropriate to discuss the events that had occurred on the Utica bus trip. Id. ¶ 94. Then, on February 2, 2017, Principal Niesz sent a letter to parents of students on the track team in which he explained that Patrick had been suspended but did not go into detail why. Id. ¶ 99.

On February 1, 2017, James Doe attended indoor track practice, however his teammates did not speak to him. Id. ¶ 98. When James Doe attended practice the following day, his teammates again ignored him. Id. ¶ 102–04. Because he was feeling alienated from his teammates, James Doe Depo. at 49, James Doe left that track practice early and did not attend team practice again. Id. ¶ 104–05.

On Friday, February 3, 2017, James Doe did not attend school. Id. ¶ 106. This caused Guidance Counselor Catlin to reach out to Jane Doe to check if everything was ok. Id. ¶ 107. Additionally, when James Doe was back in school on Monday, Assistant Principal Cronin called James Doe to his office to check in with him. Id. ¶ 110. James Doe told Cronin how his

teammates were making him feel "un-welcomed" and uncomfortable at practice. Cronin told James Doe, however, that the school would not take action to address the conduct of James Doe's teammates. Id. ¶¶ 111–12.

Later that week, on February 7, 2017, Jane Doe emailed Athletic Director Collins to tell him that James Doe did not feel comfortable at practice anymore and to ask him if James Doe could train on his own in preparation for the final indoor meets of the season. Id. ¶¶ 113–14. Collins agreed to this. Id. ¶ 115.

After February 7, 2017, Plaintiffs had no other contact with District administrators about the Utica bus trip, nor did they raise any concerns of bullying or harassment by James Doe's teammates to District officials, until they served a Notice of Claim upon the District regarding their intent to sue. Id. ¶¶ 117–18.

On February 24, 2017, after a workout on school property and a conversation with the interim indoor track coach, James Doe collapsed and lost consciousness. Dkt. No 83 ("James Doe Affidavit") ¶ 67. An ambulance brought him to the hospital where he was diagnosed as having had a vasovagal syncopal episode. Id.; Dkt. No. 83-5 ("Medical Records"). Plaintiffs attribute this episode to stress and to James Doe's deliberately reduced water intake after the January 27, 2017 incident, James Doe Aff. ¶ 64, though Defendants point out that the Medical Records appear to attribute the episode to "physical exertion," Medical Records at 5.

Patrick's suspension was lifted after the indoor track season and he was able to return to his coaching duties for the outdoor track season. District SMF ¶ 134; Resp. to District SMF ¶ 134. Wever was made a permanent District bus driver in March 2017.[7] District SMF ¶ 135.

---

[7] Though the record does not explain, apparently Wever was a temporary or part-time employee prior to March 2017.

James Doe attended the High School until his graduation in June 2017. District SMF ¶ 119. However, because Patrick had resumed coaching for the spring outdoor season, James Doe did not participate in track that season. Pls.' Additional SMF ¶ 52. Nor did he walk in the High School's graduation ceremony. District SMF ¶ 120. James Doe also decided not to attend the State University of New York ("SUNY") at Stony Brook ("Stony Brook"), where he had committed to joining the school's NCAA Division I cross-country team. James Doe Depo. at 110–11, 198–208, 211–12. Instead, he decided to attend SUNY Geneseo and compete on their team. James Doe Aff. ¶ 72.

Finally, James Doe never received any mental health treatment as a result of the Utica bus incident. Id. ¶ 132; Ind. Defs.' SMF ¶ 20.

### B. Procedural History

Plaintiffs filed their Complaint on August 3, 2017. See Docket. Plaintiffs alleged eight causes of action: (1) a substantive due process violation under the Fourteenth Amendment; (2) a violation of the Equal Protection Clause of the Fourteenth Amendment; (3) a violation of Title IX; (4) intentional infliction of emotional distress under New York law; (5) negligent infliction of emotional distress under New York law; (6) a claim against Patrick for punitive damages and attorneys' fees due to his willful and malicious conduct; (7) a claim against Wever for punitive damages and attorneys' fees due to his willful and malicious conduct; (8) loss of consortium. See Compl.

The Individual Defendants filed their answer on September 29, 2017, Dkt. No. 15, and the District filed its answer on October 2, 2017, Dkt. No. 16. After discovery, the Individual Defendants moved for summary judgment on December 6, 2018, and the District moved on December 7, 2018. See Docket.

## III.    LEGAL STANDARD

A court may grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

The Court considers, in turn, Plaintiffs': (A) due process and equal protections claims brought under Section 1983; (B) Title IX claim; (C) state law claims for intentional and negligent infliction of emotional distress; (D) request for punitive damages; and (E) loss of consortium claim.

### A. Section 1983

Plaintiffs bring their substantive due process and equal protection claims under Section 1983. In order to maintain a claim under Section 1983, a plaintiff must establish "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state . . . law." Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640 (1980) (internal quotations omitted)); United States v. Int'l Bhd. of Teamsters, 941 F.2d 1292, 1295–96 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'"). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).

As an initial matter, the claims brought under Section 1983 by Jane and John Doe on their own behalf fail as a matter of law. To the extent that Jane and John Doe's individual claims stem from alleged violations of their son's constitutional rights, these claims fail. Oliveras v. Saranac Lake Cent. Sch. Dist., No. 11-CV-1110, 2014 WL 1311811, at *24 (N.D.N.Y. Mar. 31, 2014) ("Although parents may sue on behalf of their minor child, they do not have standing to

assert claims on their own behalf for a violation of their child's rights."); <u>JG & PG ex rel. JGIII v. Card</u>, No. 08-CV-5668, 2009 WL 2986640, *6 (S.D.N.Y. Sept. 17, 2009) ("Plaintiff–Parents do not have standing to sue on their own behalf for violation of Plaintiff–Children's constitutional rights."). Additionally, there is no evidence in the record—nor even an allegation in the Complaint—that Jane or John Doe's own substantive due process rights were violated or that they personally were denied equal protection of the laws. Even were this not to settle the matter, to the extent that Jane and John Doe's constitutional claims are based on any emotional distress they personally suffered as a result of what happened to their son, these claims also fail. <u>Love v. Riverhead Cent. Sch. Dist.</u>, 823 F. Supp. 2d 193, 199 (E.D.N.Y. 2011) ("[I]t is well-settled that a cause of action may not be asserted pursuant to Section 1983 for emotional distress, loss of society, loss of services, or any other consequent collateral injuries allegedly suffered personally by a victim's family members.") (internal citations omitted); <u>Morgan v. City of New York</u>, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) ("There is no indication that [plaintiff] suffered any harm other than emotional distress due to the alleged discrimination against her daughter. Because emotional distress does not constitute a violation of a federally protected constitutional right, [plaintiff's] claim under § 1983 is dismissed."). For these reasons, the Court grants summary judgment to the Defendants as to John and Jane Doe's claims brought under Section 1983 on their own behalf.

The Court now turns to James Doe's Section 1983 claims.[8]

---

[8] The Court recognizes that, according to the Complaint, John and Jane Doe also bring claims on behalf of James Doe. For clarity's sake, when discussing James Doe's claims—whether brought by James Doe himself or through his parents—the Court will refer to "James Doe" rather than "Plaintiffs."

*1. Substantive Due Process*

James Doe alleges that Defendants' actions on and after January 27, 2017—failing to stop the bus so that James Doe could use the restroom; mocking James Doe because he needed a bathroom; and failing to adequately follow up after the incident on the bus—violated James Doe's substantive due process rights. Compl. ¶¶ 46–48. The District argues that it cannot be held liable as a matter of law under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978), that James Doe cannot identify a substantive right that he was deprived of, and that the evidence establishes that the District's conduct was not sufficiently egregious to violate the Due Process Clause.[9] District SJ Mot. at 13–22. The Court agrees that Defendants' conduct was not so egregious as to violate the Due Process Clause and, accordingly, grants the summary judgment motions.

Under the Due Process Clause of the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "[T]he Supreme Court has . . . interpreted the Due Process Clause to include a substantive component . . . [which] 'protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them.'" Parella v. Johnson, No. 15-CV-863, 2016 WL 3566861, at *9 (N.D.N.Y. June 27, 2016) (Kahn, J.) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)). "Generally, to establish a substantive due process violation, a plaintiff must (1) identify the constitutional right at stake and (2) demonstrate that the

---

[9] In contrast with the District, Individual Defendants' arguments are more limited. They argue that, "[t]o the extent Plaintiffs' claims seek recovery for negligent acts of the Defendants," "allegations of negligence are insufficient to support a claim for violation of due process." Ind. Defs.' SJ Mot. at 10–11. Despite this thin briefing, because the Court's discussion of the District's arguments also applies to the claims against Individual Defendants, the Court also grants summary judgment in favor of the Individual Defendants.

government's action were conscience-shocking or arbitrary in the constitutional sense." <u>Horton v. Westling</u>, 284 F. Supp. 3d 213, 222–23 (N.D.N.Y. 2018), <u>aff'd</u>, 765 F. App'x 531 (2d Cir. 2019) With regard to the second element, "a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" <u>Okin v. Village of Cornwall-On-Hudson Police Dep't</u>, 577 F.3d 415, 431 (2d Cir. 2009) (quoting <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n.8 (1998)).

Substantive due process has been described as the "last line of defense against those literally outrageous abuses of official power whose very variety makes formulation of a more precise standard impossible." <u>Kisembo v. NYS Office of Children & Family Servs.</u>, 285 F. Supp. 3d 509, 521 (N.D.N.Y. 2018). That said, the "shock the conscience standard is not easily met." <u>Vosburgh v. Burnt Hills - Ballston Lake Cent. Sch. Dist.</u>, No. 18-CV-1003, 2019 WL 315054, at *11 (N.D.N.Y. Jan. 24, 2019) (citing <u>Ferran v. Town of Nassau</u>, 471 F.3d 363, 369–70 (2d Cir. 2006) (internal quotation marks omitted), <u>aff'd sub nom.</u> <u>McHerron v. Burnt Hills - Ballston Lake Cent. Sch. Dist.</u>, 778 F. App'x 54 (2d Cir. 2019). Moreover, the amorphous nature of the protections provided by substantive due process implicates "a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to . . . a font of tort law." <u>Smith v. Half Hollow Hills Cent. Sch. Dist.</u>, 298 F.3d 168, 173 (2d Cir. 2002).

James Doe appears to base his substantive due process claim solely on the events of January 27, 2017, when Patrick and Wever failed to stop the bus to allow him to use the restroom and teased or mocked him for needing to use the bathroom. <u>See generally</u> Opp'n to District's SJ Mot. (discussing only the incidents of January 27 as the basis for the substantive due process claim); Opp'n to Ind. Defs.' SJ Mot. (same). Assuming, without deciding, that James Doe has

identified a cognizable constitutional right of which he was deprived,[10] and that James Doe's evidence raises a genuinely disputed issue of material fact over whether the District had a policy or custom of violating that right,[11] James Doe's claim fails as a matter of law because Defendants' conduct was not so outrageous as to shock the conscience in the constitutional sense.

"In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." Lombardi v. Whitman, 485 F.3d 73, 81 (2d Cir. 2007) (internal quotation marks omitted). In particular, "intentionally inflicted injuries are the 'most likely to rise to the conscience-shocking level.'" Horton, 284 F. Supp. 3d at 222 (quoting Cty. of Sacramento, 523 U.S. at 849). Here, despite James Doe's claim that "the intent and purpose  of Defendants' actions was for the very purpose of causing harm," Opp'n to Ind. Defs.' SJ Mot. at 10, there is no evidence in the record to suggest that Patrick or Wever intended to subject James Doe to pain, make him urinate on the bus, or cause him any physical harm at all. To the contrary, the record shows that Patrick and Wever evidently did not realize the seriousness of James Doe's need to use the bathroom and believed he could avoid urinating until they reached Utica College,

---

[10]  James Doe appears to claim that his "constitutional right[] to bodily integrity" was violated by Defendants' actions. See Opp'n to District SJ Mot. at 1, 9, 13, 21.

[11]  "School districts and boards of education are considered municipal entities." Doe by & through Doe v. E. Irondequoit Cent. Sch. Dist., No. 16-CV-6594, 2018 WL 2100605, at *16 (W.D.N.Y. May 7, 2018). Therefore, a school district cannot be held liable through respondeat superior, but only through an identified policy or custom. See Monell, 436 U.S. at 694–95; Dole v. Huntington Union Free Sch. Dist., 699 F. App'x. 85, 87 (2d Cir. Nov. 1, 2017) ("A school district is a municipal entity, and as such, cannot be held liable pursuant to § 1983 solely because of the discriminatory actions of one of its employees. [Rather,] a school district can only be held liable if its policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.") (citations and internal quotation marks omitted).

a few minutes away. See Video at 15:42:47–15:45:18 (Patrick repeatedly exhorting James Doe "you can hold it" and "you can do it"); id. at 15:56:37 (Patrick saying to himself, upon exiting the bus at Utica College, "I can't believe he couldn't hold that"); James Doe Depo. at 151 (describing how, after he urinated on the bus, Patrick and Wever "didn't mock" him anymore). To the extent, then, that James Doe has brought forward evidence of a cognizable physical injury, the evidence indicates that such injury was, at most, negligently inflicted. And because "'negligently inflicted harm is categorically beneath the threshold of constitutional due process.'" Horton, 284 F. Supp. 3d at 222 (quoting Cty. of Sacramento, 523 U.S. at 849), it cannot rise to the level of a substantive due process violation.

Other case law from this circuit—and beyond—buttresses the Court's conclusion. For example, in Smith v. Half Hollow Hills Central School District, the Second Circuit considered the dismissal of a substantive due process claim alleging that a school instructor had slapped a seventh-grader in the face "full-force," allegedly causing the student great pain and severe emotional distress, for which he eventually underwent psychotherapy. See 298 F.3d 168, 170 (2d Cir. 2002) (per curiam). The Second Circuit affirmed the dismissal because the specific conduct in question "f[ell] short of th[e] threshold" necessary to state a substantive due process claim. Id. at 173. Here, where there are no allegations that James Doe was physically abused by any District employee, nor any evidence in the record that James Doe sought medical help to deal with his mental distress, Defendants' conduct likewise falls short of the threshold necessary to state a due process claim. The Court does not believe that Patrick and Wever's conduct— declining to stop a bus full of students for a bathroom break and teasing or mocking a student who asked for that break—is more egregious than physically assaulting a seventh-grader. See Half Hollow Hills, 298 F.3d 170.

District court cases provide additional texture to the substantive due process standard in the school context and confirm that James Doe's evidence, even when viewed in the light most favorable to him, does not raise a triable issue of fact as to whether Defendants violated his substantive due process rights. See B.A. on behalf of M.G., Jr. v. City of Schenectady Sch. Dist., 209 F. Supp. 3d 515, 524 (N.D.N.Y. 2016) (granting summary judgment to defendants where evidence showed that a teacher "grabbed [the first-grader plaintiff] by both arms, shook him by the shoulders, slammed him into a chair, and yelled in his face that he should "stop crying" between thirteen and twenty times . . . ," because such evidence did not "shock the conscience"); Faccio v. Eggleston, No. 10-CV-699, 2011 WL 3666588, at *2 (N.D.N.Y. Aug. 22, 2011) (rejecting a substantive due process claim asserted by a seventh-grader who alleged that the school principal had "grabbed his arm hard" while swearing at him, that a teacher had "yelled and spat on" him, and, on a different occasion, that the school custodian had "put his hands on [him] in the school cafeteria in order to physically force [him] to sit down.").

Half Hollow Hills, B.A., and Faccio each involved situations in which a teacher or school official had a physical altercation with a student—in some cases a student younger than James Doe—and yet in no case did those actions result in a substantive due process violation. If the conduct at issue in those cases did not shock the conscience, nor can it here. Nor does the Court think that Patrick's and Wever's comments on the bus—"I guess we'll have to bring a diaper next time," etc.—elevate their conduct to the level of a substantive due process violation.[12] See Faccio, 2011 WL 3666588, at *12 ("[V]erbal abuse alone is not normally a constitutional

---

[12] Additionally, while Patrick's and Wever's comments on the bus appear to have caused James Doe emotional distress, "emotional distress does not constitute a violation of a federally protected constitutional right." Deniran v. Mattingly, No. 07-CV-6159, 2009 WL 857621, at *8 (S.D.N.Y. Mar. 31, 2009), aff'd, 377 F. App'x 117 (2d Cir. 2010).

violation—even in the context of teachers belittling students."); Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist., 77 F.3d 1253, 1255 (10th Cir. 1996) (finding no substantive due process violation where a teacher called a female sixth-grader a "prostitute" for over a month-and-a-half); Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916, 919 (8th Cir. 2001) (explaining that "the plaintiffs have not raised a genuine issue of material fact on whether [a teacher's] behavior was sufficiently shocking to the conscience to state a substantive due process claim" where evidence showed that the teacher called his seventh-grade student "retarded, stupid, and dumb" in front of her classmates and threw a notebook at her, hitting her in the face, after she got a bad grade on an assignment).

To establish that Defendants' actions constitute a due process violation, James Doe relies on Johnson v. Newburgh Enlarged School District and Knicrumah v. Albany City School District, see Opp'n to Ind. Defs.' SJ Mot. at 7–13, two cases in which courts in this circuit found that a school official's actions violated a student's substantive due process rights. But James Doe's reliance is misplaced. In Johnson, the Second Circuit affirmed the denial of qualified immunity to a gym teacher who allegedly assaulted a student by lifting him off the ground by his neck, dragging him across a gym floor, choking him, slamming the back of his head against the bleachers four times, ramming his forehead into a metal fuse box, and punching him in the face. 239 F.3d at 249 (2d Cir. 2001). Despite James Doe's suggestion to the contrary, see Opp'n to Ind. Defs.' SJ Mot. at 9 (comparing the instant case to Johnson's "malicious[] and sadistic[]" facts and stating that, "[h]ere, the conduct at issue was undoubtedly malicious and sadistic . . . [t]here is no reason within the bounds of human decency for any individual to treat another person the way that Defendants Patrick and Wever treated James Doe"), the conduct in Johnson was significantly more extreme than the conduct at issue in this case. Therefore,

Johnson sheds little light on whether Patrick's and Wever's actions crossed the high bar necessary to maintain a substantive due process violation, except to emphasize just how high that bar is. Likewise for Knicrumah, in which the Court rejected qualified immunity for a teacher who "allegedly used excessive force against plaintiff by grabbing him, slamming him against [a brick] wall, and holding him there without provocation or justification." 241 F. Supp. 2d 199, 205, 210–11 (N.D.N.Y. 2003). Here, because there is no evidence—or allegation—of excessive force, or even the use of any force at all by Patrick or Wever against James Doe,[13] Knicrumah also fails to alter the Court's conclusion.

James Doe has not pointed the court to a single case in which facts similar to those here—a school official mocking a student while preventing the student from exercising a basic human need—constituted a substantive due process violation. Nor has the Court's independent research found any. Instead, James Doe cites to cases from the prison context declaring that depriving an individual of access to a toilet is an actionable claim. See Opp'n to Ind. Defs.' SJ Mot. at 11. But as the District rightly points out, these cases are inapposite because they involved alleged violations of the Eighth Amendment's prohibition against cruel and unusual punishment, rather than substantive due process violations under the Fourteenth Amendment. See District Reply at 7 n.3. Moreover, they also concerned prisoners who were denied access to bathroom facilities over extended periods of time, rather than on a single occasion. Id. For these additional reasons, James Doe's substantive due process claim based on the events of January 27, 2017 fails.

---

[13] James Doe argues that "the excessive force in Knicrumah is analogous to the ridicule that [the] Defendants heaped upon James Doe in the most harrowing moments of this event." Opp'n to Ind. Defs.' SJ Mot. at 13. The Court does not find this convincing.

Additionally, even if the Court construes the basis of James Doe's substantive due process claim to encompass events that took place after January 27, 2017, the claim still fails. James Doe's assertion that the District violated his due process rights by failing to adequately discipline Patrick and failing to protect James Doe from retaliatory actions by his classmates do not rise to the level of a substantive due process violation. See Yap v. Oceanside Union Free Sch. Dist., 303 F. Supp. 2d 284, 295–96 (E.D.N.Y. 2004) (concluding, on summary judgment, that defendants' actions in failing to adequately address middle-schooler's complaints that he was being bullied, assaulted, and called racial epithets by his classmates did not establish substantive due process violation); Horton, 284 F. Supp. 3d at 222 ("The Supreme Court has addressed school discipline cases and commented that, '[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion . . . § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations.'") (quoting Wood v. Strickland, 420 U.S. 308, 326 (1975), aff'd, 765 F. App'x 531 (2d Cir. 2019).

The Court believes that Patrick and Wever did not handle the January 27, 2017 bus trip appropriately. But, "[r]ather than describe conduct that shocks the conscience, the evidence in the record resembles precisely the sort of wrongful acts occurring in a school environment that have been repeatedly held insufficient to state a claim of constitutional magnitude." B.A. on behalf of M.G., 209 F. Supp. 3d at 525. For that reason, the Court holds that no reasonable trier of fact could find that Defendants' conduct in this case shocked the conscience, and therefore the Court dismisses James Doe's substantive due process claim.

## 2. *Equal Protection*

James Doe claims that Defendants committed an equal protection violation because, if "a similarly situated female track team member" had asked for the bus to stop so that she could use the restroom, she "would not have been refused and/or ridiculed with such malicious actions." Compl. ¶ 50; Opp'n to District's SJ Mot. at 13. The District argues that: (1) there is no admissible evidence in the record to support James Doe's claim of sex discrimination; and (2) that, in any event, James Doe's claim against the District fails under <u>Monell</u>. District SJ Mot. at 28–33.[14] The Court agrees with Defendants' first argument and, accordingly, grants the summary judgment motions.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated be treated alike." <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439 (1985); <u>see</u> <u>Sound Aircraft Servs., Inc. v. Town of East Hampton</u>, 192 F.3d 329, 335 (2d Cir. 1999) ("At its core, equal protection prohibits the government from treating similarly situated persons differently").

As an initial matter, it is not entirely clear to the Court which conduct serves as the basis for James Doe's equal protection claim, nor on which of several possible legal theories James Doe rests his claim. The Complaint focuses only on the events that occurred on the bus on January 27, 2017 and appears to bring an equal protection claim based on a theory of "selective enforcement." <u>See</u> Compl. ¶ 50 ("[T]he actions of defendants constituted a denial of equal

---

[14] The Individual Defendants appear not to have addressed James Doe's equal protection claim in their summary judgment papers. <u>See</u> Ind. Defs.' SJ Mot at 5–12; Ind. Defs.' Reply at 3–7. However, the District's arguments are dispositive of this cause of action as to all Defendants.

protection based upon the fact that this behavior indicates selective enforcement on the basis of sex, because . . . a similarly situated female track team member would not have been refused [access to a restroom] and/or ridiculed . . . ."). By contrast, James Doe's briefing in response to Defendants' summary judgment motions rests his equal protection claim on a "deliberate indifference" theory based on the failure of the District to prevent student-on-student gender-based harassment. See Opp'n to District SJ Mot. at 15–16.[15]

Turning first to the deliberate indifference theory, James Doe is, of course, correct that an Equal Protection Clause violation "in the school setting" can arise out of "deliberate indifference to student-on-student [sexual] harassment." Faccio, 2011 WL 3666588, at *10 (citing Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009)); see also Preston v. Hilton Cent. Sch. Dist., 876 F. Supp. 2d 235, 244 (W.D.N.Y. 2012) ("[T]eachers, administrators, and boards of education can be held liable under the Fourteenth Amendment if they have been deliberately indifferent to discriminatory harassment of a student at school by other children."). However, to the extent that James Doe's equal protection claim is based the alleged failure of the District in the aftermath of the Utica trip to prevent student-on-student harassment, such a claim fails. Simply put, there is no evidence in the record that any purported "harassment" by James Doe's peers was motivated by his sex.[16] To the contrary, the evidence shows that the actions of James

---

[15] Plaintiffs' briefing does not argue that Patrick or Wever themselves were deliberately indifferent to any harassment of James Doe by his peers after the January 27, 2017 Utica trip, nor is there evidence that James Doe ever interacted with either defendant again. Therefore, James Doe's deliberate indifference theory must concern the District only.

[16] For the purposes of this motion, the Court assumes, without deciding, that the conduct of James Doe's friends and teammates—ignoring and ostracizing him, see James Doe Depo. at 65–66 (describing how James Doe's teammates caused him to feel isolated and alienated by "not saying anything" to him and "not caring about how [he] felt")—constitutes harassment under the Equal Protection Clause.

Doe's friends and teammates after January 27, 2017 were a reaction to James Doe reporting Patrick and Patrick's resulting suspension by the District. See, e.g., James Doe Aff. ¶ 75 ("After th[e January 27, 2017] incident I was caused to experience the humiliation anew every day when my track team members ignored me, blamed me for the suspension of Defendant Patrick, and retaliated against me in accordance with that belief."); Dkt. No. 83-7 ("Jane Doe Affidavit") ¶ 22 ("[James Doe] informed me that his teammates had been alienating him. We believed that this was retaliation against him for reporting Defendant Patrick's conduct, and this was later confirmed."); Dkt. No. 80-26 ("Response to District's First Set of Interrogatories") at 6 (when asked to identify which teammates had harassed James Doe, stating "[e]ach individual who was on the indoor track team was annoyed and angry at the plaintiff and blamed the plaintiff for having the coach suspended."); James Doe Depo. at 47–49 (describing how members of the track team stopped speaking with James Doe after they found out Patrick had been suspended).  For this reason, James Doe has failed to raise a triable issue of fact as to whether Defendants' violated his equal protection rights in the aftermath of the Utica trip.

Nor has James Doe raised a triable issue of fact as to whether an equal protection violation occurred on the Utica trip itself. As described above, James Doe appears to bring this claim under a selective enforcement theory.[17] Under a "selective enforcement" theory, a plaintiff must prove that "(1) . . . compared with others similarly situated, [she or he] was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad

---

[17] Because James Doe has pointed to no discriminatory law or district policy, nor argued that he constitutes a "class of one," he has not established an equal protection violation under any of the other common doctrinal tests. See Kisembo, 285 F. Supp. 3d at 523–24 (describing different theories under which a plaintiff can bring an equal protection claim).

faith intent to injure a person." <u>Brown v. City of Syracuse</u>, 673 F.3d 141, 151–52 (2d Cir. 2012) (internal quotation marks and citations omitted). Under the first prong, "at the summary judgment stage, a plaintiff must present evidence comparing herself to individuals that are similarly situated in all material respects." <u>J.E. ex rel. Edwards</u>, 898 F. Supp. 2d at 547–48. The second prong establishes a "deliberately rigorous standard," <u>United States v. Alameh</u>, 341 F.3d 167, 173 (2d Cir. 2003) (internal quotation marks omitted), "under which plaintiff must show that the defendants [acted] 'at least in part because of, not merely in spite of,' plaintiff's [protected characteristic]," <u>Anderson v. City of New York</u>, 817 F. Supp. 2d 77, 95 (E.D.N.Y. 2011) (quoting <u>Wayte v. United States</u>, 470 U.S. 598, 610 (1985)) (other internal quotation marks omitted).

In evaluating this claim, the Court looks first to whether James Doe has identified any suitable comparators. The District argues—and James Doe does not dispute—that the only possible comparator based on the record is B.W., the member of the girl's track team who, on the Utica bus trip, asked Patrick about using the bathroom sometime before James Doe. <u>See</u> District SJ Mot. at 33; Opp'n to District SJ Mot. at 15–17. However, the District further argues that B.W. is not "similarly situated" to James Doe "in all material respects," and therefore cannot be used as a comparator. District SJ Mot. at 30–32. The District points primarily to B.W.'s age (she was fourteen, three years younger than James Doe) and to the fact that she asked to use the bathroom earlier in the trip, before the bus entered the Thruway. <u>Id.</u> at 30. The Court acknowledges these differences and can imagine a situation in which a high school teacher would respond differently to a request by a fourteen-year-old freshman than a senior, but believes that a reasonable jury could find that James Doe and B.W. were similarly situated in all material respects. <u>Savino v. Town of Se.</u>, 983 F. Supp. 2d 293, 306 (S.D.N.Y. 2013) ("Generally, whether people are

similarly situated 'is a factual issue that should be submitted to the jury . . . .'" (quoting Harlen

Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001), aff'd, 572 F. App'x 15

(2d Cir. 2014). Therefore, James Doe has successfully raised a genuine issue of material fact as

to whether B.W. is a suitable comparator. See Mercier v. Kelly, No. 10-CV-7951, 2013 WL

4452486, at *5 (S.D.N.Y. Aug. 19, 2013) ("[T]o survive a motion for summary judgment, [the

plaintiff] must produce sufficient facts for a jury to find that [he and the comparator] were

'roughly equivalent.'").

       Next, the Court examines whether the evidence raises a triable issue of fact as to whether

James Doe and B.W. were "treated differently" from one another in a manner actionable under

the equal protection clause. Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir.

2007). The District rightly points out that "there is no dispute that both a male [James Doe] and

female [B.W.] member of the indoor track team asked for the bus to stop to use the bathroom and

the bus did not stop for either student." District SJ Mot. at 30. James Doe acknowledges this, but

retorts that the "circumstances under which [B.W. and James Doe] w[ere] required to [wait] were

extraordinarily different." Opp'n to District SJ Mot. at 16. He then points out how Patrick and

Wever "taunted" and "mocked" James Doe, but not B.W. Opp'n to District SJ Mot. at 16–17. It

is true that Patrick's and Wever's reactions to these two students' requests for a pit stop were not

identical, however it is also true that their *decision* regarding whether to stop for a restroom was

the same. Regardless of the gender of the student making the request, the bus did not stop, and

all students had to wait an equal amount of time before the bus arrived at Utica and they could

access a bathroom. Therefore, the only differential conduct upon which James Doe can base his

equal protection claim is the fact that Patrick and Wever "mocked" and "taunted" him in

response to his request to use the bathroom, but did not mock B.W. James Doe's selective

enforcement claim thus fails here because "[i]t is well established that verbal abuse and profanity is not actionable conduct under 42 U.S.C. § 1983, because such abuse does not violate any protected federal right." Kilcher v. Albany Cty., No. 19-CV-158, 2019 WL 911192, at *9 (N.D.N.Y. Feb. 25, 2019), report and recommendation adopted sub nom. Kilcher v. Craig Apple/Albany Cty. Sheriffs Dep't, No. 19-CV-158, 2019 WL 1516933 (N.D.N.Y. Apr. 8, 2019); see also Beal v. City of New York, No. 92-CV-718, 1994 WL 163954, at *6 (S.D.N.Y. Apr. 22, 1994) ("[M]ere verbal abuse, and even vile language, does not give rise to a cognizable claim under Section 1983"), aff'd, 89 F.3d 826 (2d Cir. 1995); Brown v. Croce, 967 F. Supp. 101, 104 (S.D.N.Y. 1997) ("Brown's claim of racial slurs or epithets reflecting racial prejudice cannot form the basis of a claim under § 1983.").

However, even assuming that James Doe had raised a genuine issue of material fact as to whether he was treated less favorably than B.W. in a manner cognizable under Section 1983, his claim would founder because there is no evidence of discriminatory gender-based animus on the part of Patrick and Wever. To prevail on a selective enforcement claim, "plaintiffs must prove that the disparate treatment was caused by the impermissible motivation . . . ; [t]hey cannot merely rest on a showing of disparate treatment." Bizzarro v. Miranda, 394 F.3d 82, 87 (2d Cir. 2005); see also Crowley v. Courville, 76 F.3d 47, 53 (2d Cir. 1996) ("[A] demonstration of different treatment from persons similarly situated, without more, would not establish malice or bad faith"). To establish Patrick's impermissible motivation, James Doe relies in particular on two prior bus trips the track team took to Utica.[18] Opp'n to District SJ Mot. at 17. On the first,

---

[18] James Doe points to no similar instances of Wever's prior conduct to demonstrate that Wever acted with impermissible motivation on January 27, 2017. Nor has the Court found any in its own, independent review of the record. Indeed, January 27, 2017 was the first time James Doe had ever met Wever. See James Doe Depo. at 26. Therefore, there is no genuinely disputed issue

"James Doe was required to use a female student's cellphone to ask for the bus to stop." Id. And on the second, "all of the boys on the indoor track team were denied a collective request to use the bathroom but were able to do so once the driver herself needed to stop." Id.

These examples fail to substantiate James Doe's claims. With regard to the first, though James Doe testified that he chose to use a female teammate's cellphone to ask Patrick to make a rest stop, he could not state why he did so, and there is no evidence that James Doe or any other male member of the team asked for a pit stop prior to James Doe sending the text and that Patrick refused such a request. See James Doe Depo. at 130–33. Without such evidence, the fact that James Doe used a female teammate's cellphone to ask Patrick to stop the bus for a bathroom break is not probative as to whether Patrick, because of the gender of the student asking, would have stopped for a girl and not for a boy. As for James Doe's second example, the only evidence that the bus stopped on the earlier trip solely because the female bus driver needed to use the bathroom is James Doe's testimony. Id. at 133–34. However, James Doe also testified that he believed this because someone—"[p]robably one of [his] parents"—had told him that was why. Id. Consequently, James Doe's testimony is based on hearsay and the Court cannot consider it on summary judgment. ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 357 (2d Cir. 1997) (hearsay evidence "would . . . be inadmissible at trial and cannot create a triable issue of fact"). These examples thus do not serve to demonstrate any "impermissible motivation" on the part of Patrick, and James Doe's claims as to Patrick's motives must be speculative at best. Where, as here, there is "nothing more than speculation to support [a party's] claims," summary judgment is appropriate. Harlen, 273 F.3d at 502.

---

of material fact as to whether Wever acted with impermissible motivation, and the following discussion focuses exclusively on Patrick.

Therefore, the Court grants summary judgment to Patrick and Wever on the selective enforcement claim. Further, because there is no genuine issue of material fact as to whether Patrick and Wever committed an equal protection violation during the Utica bus trip, and no other District employees were present on the bus, the District likewise cannot be held liable based on the events of that day. See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) (observing that there must be an underlying constitutional violation to support a Monell claim); Rutigliano v. City of New York, 326 F. App'x 5, 9 (2d Cir. 2009) (affirming summary judgment dismissal of the plaintiff's Monell claim where the court dismissed all of the plaintiff's section 1983 claims).[19] Therefore, the Court also grants summary judgment to the District on the selective enforcement claim.

**B. Title IX**

Plaintiffs allege that the District violated Title IX by "demonstrat[ing] deliberate indifference toward the abuse and harassment its employees inflicted upon James Doe . . . based

---

[19]  Additionally, to avoid summary judgment on the Monell claim against the District, James Doe would have to show that his equal protection rights were violated pursuant to some District policy or custom. See Monell, 436 U.S. at 694–95. However, James Doe appears to acknowledge that Patrick and Wever—the only District officials present on the Utica bus trip— "were not adhering to any policy when they refused James Doe's reasonable and timely requests to stop somewhere for a bathroom, and certainly were not doing so when they proceeded to degrade him." Opp'n to Ind. Defs.' SJ Mot. at 15. Nor is there any evidence in the record that it was District custom not to stop school busses for bathroom breaks and to "degrade" students who asked for a break. Therefore, James Doe's Monell claim would fail for this alternative reason as well.

on his gender."[20, 21] Compl. ¶¶ 54–55. They argue in their summary judgment opposition briefing

that the District was also deliberately indifferent to the retaliatory actions of James Doe's

teammates. Opp'n to District SJ Mot. at 9–10. This deliberate indifference allegedly deprived

James Doe of "significant educational experiences, such as his graduation ceremony, practicing

with his teammates," his "senior outdoor track season," and "his commitment to a Division I

university." Compl. ¶ 56. The District moves for summary judgment on all these claims, which,

for the following reasons, the Court now grants.

Title IX "prohibits sexual discrimination (including harassment) by federally-funded

educational institutions."[22] Hayut v. State Univ. of New York, 352 F.3d 733, 749 (2d Cir. 2003)

(citing 20 U.S.C. § 1681(a)). Another court in this Circuit has helpfully described the law

applicable to a deliberate indifference claim:

---

[20] Though the Complaint's specific allegations under this cause of action discuss only the actions of the "Greenwich CSD [Central School District]," Compl. ¶¶ 54–55, the Complaint also alleges more generally that "the actions of *defendants* . . . constituted discrimination on the basis of sex . . . ," Compl. ¶ 53 (emphasis added). To the extent that James Doe attempts to bring claims under Title IX against Patrick and Wever, the Court grants summary judgment to those defendants. See Tyrrell v. Seaford Union Free Sch. Dist., 792 F. Supp. 2d 601, 622 (E.D.N.Y. 2011) ("Since Title IX does not authorize suits against school officials, teachers, and other individuals, to the extent plaintiff asserts a Title IX claim against any of the individual defendants, those claims are dismissed with prejudice.") (citing Fitzgerald, 555 U.S. at 256–57).

[21] Similarly to the claims brought under Section 1983, John and Jane Doe "cannot recover on any derivate claim under Title IX . . . , as there is no allegation or evidence that [they] w[ere] subjected to discrimination under a federally funded education program . . . ." Romero v. City of New York, 839 F. Supp. 2d 588, 602 (E.D.N.Y. 2012); see also Bliss v. Putnam Valley Cent. Sch. Dist., No. 06-CV-15509, 2011 WL 1079944, at *3 (S.D.N.Y. Mar. 24, 2011) (finding that father of a student victim of sexual assault by a teacher "cannot recover on any derivative claim based on Title IX . . . ."). Therefore, the Court grants summary judgment to Defendants on John and Jane Doe's Title IX claim.

[22] Though there does not appear to be evidence in the record that the District receives federal funding, for the purposes of this motion, the Court assumes that it does, and thus may be subject to suit under Title IX.

An educational institution may also be held liable under Title IX for "deliberate indifference to known acts of harassment" of one student by another, <u>Davis v. Monroe Cty. Bd. of Educ.</u>, 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), or of a student by a teacher, <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290–91, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); <u>see also</u> <u>Davis</u>, 526 U.S. at 650, 119 S.Ct. 1661 (stating that sexual harassment, if sufficiently severe, is a form of "discrimination" under Title IX). A school may be held liable under this theory if it was "deliberately indifferent to sexual harassment, of which [it] ha[d] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." <u>Davis</u>, 526 U.S. at 650, 119 S.Ct. 1661. The student-on-student or teacher-on-student harassment forming the basis for a Title IX claim must also, of course, be "gender-oriented." <u>Id.</u> at 651, 119 S.Ct. 1661. In order to constitute deliberate indifference, the school's actions must be "clearly unreasonable in light of the known circumstances." <u>Id.</u> at 648, 119 S.Ct. 1661. This is not a "mere 'reasonableness' standard." <u>Id.</u> at 649, 119 S.Ct. 1661. Title IX does not require schools to "'remedy' peer harassment" or to "ensure that students conform their conduct to certain rules." <u>Id.</u> at 648, 119 S.Ct. 1661 (alterations omitted). "On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." <u>Id.</u> at 648–49, 119 S.Ct. 1661.

<u>Nungesser v. Columbia Univ.</u>, 244 F. Supp. 3d 345, 362 (S.D.N.Y. 2017). To survive summary judgment, a plaintiff must raise a genuinely disputed issue of material fact as to all three elements of the Title IX claim: "(1) the school authorities had actual knowledge of the [gender-based] harassment; (2) they were deliberately indifferent to the harassment; and (3) the harassment was so severe, pervasive, and objectively offensive that it deprived plaintiff of access to the education[] . . . provided by the school." <u>See</u> <u>Carabello v. New York City Dep't of Educ.</u>, 928 F. Supp. 2d 627, 638 (E.D.N.Y. 2013). Both with respect to his student-on-student claim and teacher-on-student claim, James Doe has failed to do so.

First, regarding James Doe's claim that the District was deliberately indifferent to the harassing actions of his track teammates, there is no evidence in the record that the claimed "harassment" was gender-based. As described above, James Doe states in his affidavit that his teammates "ignored" him and "retaliated against him in accordance with th[eir] belief" that he

had caused "the suspension of Defendant Patrick." James Doe Aff. ¶ 75. Also, in his deposition, James Doe testified that his teammates began to "treat [him] differently because [he] reported" the January 27, 2017 incident to the school administration. James Doe Depo. at 63; see also id. at 65 ("I think a lot of [the alleged harassment] was[] because I reported it and got him suspended that they were upset with me because they cared a lot about Mr. Patrick."). The remainder of the record does nothing to contradict these statements. Therefore, there is no triable question of fact as to whether James Doe suffered any gender-based harassment. See Nungesser, 244 F. Supp. 3d at 363 (rejecting Title IX claim for failure to plead "actionable sexual harassment" where plaintiff was harassed by a fellow student because of her "personal animus against him, not because of his status as a male").

There is also no evidence in the record that the harassment experienced by James Doe was severe enough to establish a Title IX violation. The record indicates that James Doe's teammates caused him to feel harassed by ceasing to speak with him and declining to interact with him. See James Doe Aff. ¶ 59 ("[M]y teammates ignored me. They did not speak to me and they physically turned themselves away from me whenever I approached."); id. ¶ 63 ("All of my teammates and the assistant coaches ignored me and walked away from me when I approached them."); James Doe Depo. at 65. Without belaboring the point, the Court does not believe that the described conduct is sufficiently "severe, pervasive, and objectively offensive" to constitute actionable harassment under Title IX. See Tyrrell, 792 F. Supp. 2d at 628 ("[I]t is not enough to establish that a student has been teased . . . or called . . . offensive names.") (internal quotation

marks omitted).[23] In light of this evidence, James Doe's student-on-student deliberate indifference claim fails.

James Doe's teacher-on-student deliberate indifference claim is similarly faulty. First, for the reasons described above in the Court's discussion of equal protection, there is no evidence that Patrick's or Wever's alleged "harassment" was motivated by James Doe's gender. Also, for the reasons described in the previous paragraph, there is no evidence that Patrick's or Wever's actions were "so severe, pervasive, and objectively offensive that" James Doe was deprived of "access to the education educational opportunities or benefits provided by the school." See Carabello, 928 F. Supp. 2d at 642.

Further, there is no evidence that the District was deliberately indifferent to Patrick's and Wever's alleged "harassment." Superintendent Fish responded within seventeen minutes to Jane Doe's initial email of January 28, 2018. Dkt. No. 80-9. Principal Niesz contacted Plaintiffs that same day and met with Plaintiffs that weekend. Dkt. No. 80-3 ("Niesz Affidavit") ¶¶ 3, 5. That weekend, he also reviewed the video of the bus trip, met with Patrick, and suspended him indefinitely. Id. ¶ 6; Dkt. No. 80-17. Niesz contacted James Doe's guidance counselor about the incident and contacted S.L.'s parents to ask them to have S.L. take down his post about the

---

[23]  There is also no evidence that James Doe was "denied . . . equal access to an educational program or activity" in the sense necessary to establish a Title IX violation. Davis, 526 U.S. at 652. James Doe alleges that his teammates' behavior prevented him from participating in school activities such as outdoor track and graduation, and "necessitated his withdrawal" from SUNY Stony Brook. Compl. ¶ 45. But the record indicates that James Doe decided himself not to participate in those activities, rather than being prevented from participating by actions of the District. See James Doe Depo. at 46, 109 (outdoor track); id. at 103–05 (graduation); id. at 110–11 (Stony Brook); Dkt. No. 83-6 (Stony Brook). This evidence cannot satisfy Davis' strictures. See Nungesser, 244 F. Supp. 3d at 370 (reasoning that a Title IX plaintiff was not "precluded" from attending school events where he did "not allege that he attempted to attend them or that he was turned away at the door," but instead felt "discouraged" from attending them by the inadequate response of the school administration to his classmates' harassing behavior).

incident on the Utica trip. Id. ¶ 4, 8. In the weeks following the incident, Principal Niesz also spoke with Jane Doe on the phone and "spoke informally with James Doe in school on several occasions to see how he was doing." Id. ¶ 12. Though James Doe protests that the District conducted a "woefully insufficient" investigation of the incident, "did not fire Defendant Patrick or Defendant Wever," and did not "consider suspending Defendant Patrick for the remainder of the school year," Opp'n to District SJ Mot. at 10–11, "Title IX does not require school administrators to . . . take particular disciplinary action; nor does Title IX grant students the right to make particular remedial demands." Nungesser, 244 F. Supp. 3d at 371 (citing Davis, 526 U.S. at 648) (internal quotation marks omitted). Considering the steps taken by the District in the aftermath of the January 27, 2017 incident, the Court cannot find that the District's actions were "clearly unreasonable in light of the known circumstances," as is necessary for a deliberate indifference finding. See Tubbs v. Stony Brook Univ., 343 F. Supp. 3d 292, 309 (S.D.N.Y. 2018) ("[The deliberate indifference standard] requires only that school administrators respond to known peer harassment in a manner that is not clearly unreasonable in light of the known circumstances.").

The Court therefore grants Defendants' motions for summary judgment on this issue.

## C.  State Law Claims

In addition to their federal claims, Plaintiffs' fourth and fifth causes of action bring claims under New York tort law. The Court may exercise subject matter jurisdiction over those claims due to the supplemental jurisdiction provided by 28 U.S.C. § 1367(a). However, under § 1367(c), the Court may decline to exercise supplemental jurisdiction over a state law claim if all claims over which it had original jurisdiction are dismissed. 28 U.S.C. § 1367(c)(3); see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182–83 (2d Cir. 2004) ("The

exercise of supplemental jurisdiction is left to the discretion of the district court . . . .”). “[A] district court should consider [the following factors] when deciding whether to exercise supplemental jurisdiction: (1) whether state law claims implicate [] the doctrine of preemption; (2) judicial economy, convenience, fairness, and comity; (3) the existence of novel or unresolved questions of state law; and (4) whether state law claims concern the state’s interest in the administration of its government.” Drake v. Lab. Corp. of Am. Holdings, 323 F. Supp. 2d 449, 452 (E.D.N.Y. 2004) (quoting Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305–06 (2d Cir. 2003) (internal quotation marks and citations omitted). While “[d]ismissal of . . . pendent state law claims is not . . . absolutely mandatory,” Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998), “[a]s a general rule, ‘where federal law claims are dismissed before trial, the state claims should be dismissed as well,’” In re Jetblue Airways Corp. Privacy Litig., 379 F. Supp. 2d 299, 310 (E.D.N.Y. 2005) (quoting Marcus, 138 F.3d at 57).[24]

The Valencia factors weigh against exercising jurisdiction in this case. First, there is no issue of federal preemption. Second, because the federal claims have been eliminated before trial, considerations of judicial economy, convenience, fairness and comity weigh against exercising jurisdiction over Plaintiffs’ state-law claims. See Sprole v. Underwood, No. 18-CV-1185, 2019 WL 4736241, at *7 (N.D.N.Y. Sept. 27, 2019) (Kahn, J.) (“[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered

---

[24]  Though the District only addresses supplemental jurisdiction in a footnote, see District SJ Mot. at 23 n.9, and Plaintiffs do not appear to address the issue in their briefing at all, see generally Opp’n to District SJ Mot.; Opp’n to Ind. Defs.’ SJ Mot., the Court may sua sponte consider the extent of its jurisdiction. Terrill v. Windham-Ashland-Jewett Cent. Sch. Dist., 176 F. Supp. 3d 101, 112 (N.D.N.Y. 2016) (declining sua sponte to exercise jurisdiction over parent-and-student plaintiffs’ state law claims after dismissing their federal claims against school district defendant); Star Multi Care Servs., Inc. v. Empire Blue Cross Blue Shield, 6 F. Supp. 3d 275, 293 (E.D.N.Y. 2014) (“[T]he Court sua sponte declines to exercise supplemental jurisdiction over the remaining [state law] claims against [defendants].”).

under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." (quoting Chris H. v. New York, 764 F. App'x 53, 56 (2d Cir. 2019))). And while Plaintiffs' claims may not raise novel or unresolved issues of state law, "[t]he issue of general tort liability for municipalities . . . [is often a] fundamental and complex question[] . . . best left to the courts of the state when the early disposition of all federal claims makes the federal court's resolution of such state-law claims unnecessary." Krzykowski v. Town of Coeymans, No. 06-CV-835, 2008 WL 5113784, at *7 (N.D.N.Y. Nov. 25, 2008) (alterations in original) (internal quotation marks omitted) (quoting Valencia, 316 F.3d at 306).

For these reasons, and because "[c]ourts routinely decline to exercise supplemental jurisdiction where the only remaining claims are state law claims," Spiteri v. Russo, No. 12-CV-2780, 2013 WL 4806960, at *63 (E.D.N.Y. Sept. 7, 2013), aff'd sub nom. Spiteri v. Camacho, 622 F. App'x 9 (2d Cir. 2015), the Court declines to exercise jurisdiction over Plaintiffs' state law claims. See also First Capital, 385 F.3d at 183 ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Yap, 303 F. Supp. 2d at 298 (declining to exercise supplemental jurisdiction over student-and-mother plaintiffs' state law claims against school-district-and-teacher defendants after granting defendants' motion for summary judgment and dismissing plaintiffs' federal equal protection and substantive due process claims).

### D.  Punitive Damages

Plaintiffs' sixth and seventh causes of action seek punitive damages and attorneys' fees from Patrick and Wever for their "willful, malicious, harmful, and inten[tional]" actions. Compl. ¶¶ 68–71. "Punitive damages are recoverable against governmental officials sued in their

individual capacities where their conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" <u>Hogan v. Lewis Cty.</u>, No. 16-CV-1325, 2018 WL 4689094, at *22 (N.D.N.Y. Sept. 28, 2018) (Kahn, J.) (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983)). However, "[e]ven if punitive damages are allowable on Plaintiffs' state law claims and § 1983 claims . . . , the Court finds that Plaintiffs cannot recover such damages against . . . Defendants for the simple fact that all of the claims . . . have been dismissed." <u>Hogan</u>, 2018 WL 4689094, at *22; <u>see also</u> <u>Jones v. E. Brooklyn Sec. Servs. Corp.</u>, 11-CV-6333, 2014 WL 4724699, at *3 n.1 (E.D.N.Y. Sept. 23, 2014) ("[A] separate claim or demand for punitive damages must be dismissed when all claims for liability are dismissed."); <u>Fagan v. AmerisourceBergen Corp.</u>, 356 F. Supp. 2d 198, 219 n.6 (E.D.N.Y. 2004) (noting that, "since all of the claims against [defendant] are dismissed, the plaintiffs' punitive damages claims against it are dismissed as well").

### E. Loss of Consortium

Plaintiffs' eighth and final cause of action seeks damages and attorneys' fees for loss of consortium. To the extent Plaintiffs bring their loss of consortium claim under state law, for the reasons stated above, the Court declines to exercise jurisdiction. To the extent Plaintiffs bring their claim under federal law, the Court dismisses the claim. "Although the Second Circuit has not ruled on a loss of consortium claim under § 1983, all four New York district courts have . . . [and] do not recognize the loss of consortium under § 1983. <u>Baxton v. Artus</u>, No. 13-CV-6635, 2015 WL 8958773, at *4 (W.D.N.Y. Dec. 15, 2015) (collecting cases); <u>see also</u> <u>Brown v. City of Hartford</u>, No. 08-CV-1416, 2009 WL 10713716, at *3 (D. Conn. July 17, 2009) ("[A] claim for loss of consortium cannot be brought under federal civil rights statutes . . . ."); <u>Hart v. Paint Valley Local Sch. Dist.</u>, No. 01-CV-4, 2002 WL 31951264, at *16 (S.D. Ohio Nov. 15, 2002)

("No authority exists for the proposition that Plaintiff . . . may bring a loss of consortium claim based on an underlying violation of Title IX."). Therefore, the Court grants summary judgment to Defendants on Plaintiffs' federal loss of consortium claim.

## V.  CONCLUSION

The Court has no doubt that January 27, 2017 was a difficult day for James Doe, that the days afterward were similarly challenging, and that Defendants, particularly Patrick, did not handle the situation appropriately. However, for the above reasons, this Court cannot provide James Doe with relief.

Accordingly, it is hereby:

**ORDERED**, that the Individual Defendants' motion for summary judgment (Dkt. No. 77) and the District's motion for summary judgment (Dkt. No. 80) are **GRANTED** as to all federal causes of action; and it is further

**ORDERED**, that the Court **DECLINES** to exercise jurisdiction over Plaintiffs' state law causes of action; and it is further

**ORDERED**, that the Complaint (Dkt. No. 1) is **DISMISSED** in its entirety; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      February 03, 2020
            Albany, New York

_____
Lawrence E. Kahn
Senior U.S. District Judge